IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JOSE VILLAREAL,

        **Plaintiff,**

vs.                                                                        Civ. No.  08-002 JH/CEG

IVAN ZARATE, et al.,

        **Defendants.**

## MEMORANDUM OPINION AND ORDER

This matter came before the Court on *Defendant My Way Holdings, LLC's Motion for Summary Judgment* [Doc. No. 69]. After considering the law, the evidence, and the arguments of the parties, the Court concludes that the motion should be denied in its entirety.

## LEGAL STANDARD

Summary judgment generally is appropriate when a court determines that "'there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law.'" *Thrasher v. B & B Chem. Co.*, 2 F.3d 995, 996 (10th Cir. 1993) (citation omitted). Under Rule 56(c), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

To carry its initial burden, the moving party need not negate the nonmoving party's claim. *See Allen v. Muskogee, Okl.*, 119 F.3d 837, 840 (10th Cir. 1997), *cert. denied sub nom. Smith v. Allen*, 522 U.S. 1148 (1998). "'Instead, the movant only bears the initial burden of 'showing'—that

is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party meets its burden, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). A plaintiff cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment but rather must produce some specific factual support of its claim. *See Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988); *Fritzcshe v. Albuquerque Mun. Sch. Dist.*, 194 F. Supp. 2d 1194, 1206 (D.N.M. 2002). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). Upon a motion for summary judgment, a court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence." *Kaus v. Standard Ins. Co.*, 985 F. Supp 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998). If there is no genuine issue of material fact in dispute, then a court must next determine whether the movant is entitled to judgment in its favor as a matter of law. *See, e.g.*, *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex*, 477 U.S. at 322.

**FACTS**

Unless otherwise noted, the facts of this case are undisputed. On January 2, 2005, Plaintiff Jose Villareal ("Villareal") arrived at Sunland Park Racetrack and Casino[1] ("the casino") to meet

---

[1] Defendant My Way Holdings, LLC, the movant, does business as Sunland Park Racetrack and Casino.

with friends and bet on horse races. After some successful wagers, Villareal bought drinks for himself and his friends. At approximately 9:30 p.m., the bartender informed Villareal and his friends that they had too much to drink. After initially saying that the group could stay but were cut off from further alcohol service, the bartender then said that the group had to leave. Shortly thereafter, three security officers (employees of the Sunland Park Casino), arrived and again told Villareal and his friends that they had been drinking too much and needed to leave. Then, the security officers requested assistance from Sunland Park Police Officers. In response, Defendants Ivan Zarate ("Zarate") and Gustav Carillo ("Carillo"), officers from the Sunland Park Police Department, arrived at the scene. Unlike the casino's security officers, Zarate and Carillo wore official Sunland Park Police uniforms and badges, along with weapons; they did not wear or display anything that indicated that they were working for the casino, although they were equipped with casino dispatch radios. Zarate and Carillo also told Villareal and his friends that they had to leave the premises. Villareal and his friends went to the exit and down the stairs, while Zarate followed. When Villareal reached the bottom of the stairs, he asked a casino security guard, "what's going on?" Then, Zarate used a "spinning arm-bar takedown" to physically subdue Villareal and place him under arrest. None of the Sunland Park Casino security officers participated directly in the takedown or the arrest.

At the time of the arrest, Zarate and Carillo were moonlighting at the casino. The moonlighting police officers' primary duty was to provide police visibility in order to deter crime and misconduct at the casino. There is no evidence in the record of a written contract between either the officers or the Sunland Park Police Department and the casino. *See* Olivas Depo. at p. 20; Carillo Depo. p. 64. According to Zarate, there was a verbal "understanding" between the Sunland

Park Police Department and the casino that its officers would moonlight at the casino. Zarate Depo. at pp. 37-38. *See also* Carillo Depo. at pp. 63-64. Sunland Park police officers who were interested in "moonlighting" at the casino volunteered for the job and were required to obtain permission from the police chain of command. Jesse Olivas, security manager at Sunland Park Casino, negotiated the officers' rate of pay with Zarate. There is a fact dispute regarding how the officers were assigned to work at the casino. One officer testified that he was assigned to the casino by the Sunland Park duty officer. Carillo Depo. at p. 38. On the other hand, Olivas testified that he set up the schedules for the Sunland Park Police officers who were moonlighting at the casino. Olivas p. 12. In any event, the Sunland Park Police officers typically worked at the casino Friday, Saturday, and Sunday evenings.

When they arrived at the casino for duty, the police officers would sign in, punch a time card, and check with the security supervisor who would often direct them to a particular area of the casino where he felt their presence was needed, such as locations where special events were taking place. Other than dispatch radios, the casino did not provide Zarate or Carillo with any tools, uniforms, or equipment for the job. If an incident occurred at the casino and could not be handled by the casino's security officers, they would turn it over to the moonlighting Sunland Park Police officers. Once the casino turned over a situation to the police officers, the casino no longer exercised control over the situation nor did it direct the manner in which the police officers would handle the incident. Hypothetically, if a Sunland Park Police officer acted in an inappropriate manner under the casino's policies and procedures, Olivas would have the authority to tell him to stop, Olivas Depo. at p. 20, though there is no evidence of such an event occurring. However, there is no evidence that Olivas or anyone at the casino had the authority to tell the police officers how to respond to security

incidents, whether or not to arrest someone, how to conduct an arrest, and so forth. *See* Keaton Depo. at p. 25. The casino did not maintain a personnel file for either Carrillo or Zarate at the time of the events in question, nor did it provide them with employment benefits such as disability insurance, retirement/pension, health insurance, vacation pay, or sick leave. The casino compensated the officers by the hour and paid them directly by checks made out to them individually; those funds did not flow through the Sunland Park Police Department. The casino did not withhold state or federal income taxes or Social Security taxes from Carrillo and Zarate's compensation.

## DISCUSSION

In Count I of his Second Amended Complaint, Villareal asserts claims for violation of his constitutional rights pursuant to 42 U.S.C. § 1983 against the individual officers, the police department, and the City of Sunland Park only. In Count II, he asserts claims against the casino for state law torts of assault and battery under a theory of vicarious liability and respondeat superior, as well as a claim for premises liability. The casino moves for summary judgment on Count II on the grounds that Zarate and Carillo were independent contractors for whose actions it was not responsible, and on the grounds that it breached no duty to Villareal.

I.  **THE CASINO'S VICARIOUS LIABILITY FOR ZARATE AND CARILLO**

   A. **Were They Employees or Independent Contractors?**

New Mexico follows the general rule set forth in the Restatement (Second) of Torts § 409 (1965), which provides that one who employs an independent contractor is not liable for physical harm caused to another by the negligent acts of that contractor. *See also Saiz v. Belen Sch. Dist.*, 113 N.M. 387, 393, 827 P.2d 102, 108 (1992) ("As a general rule, an employer of an independent

contractor is not responsible for the negligence of the contractor or his employees."). "In determining whether an employer-employee relationship exists, . . . the primary test is whether the employer has the right to control the details of the work to be performed." *Savinsky v. Bromley Group, Ltd.*, 106 N.M. 175, 176, 740 P.2d 1159, 1160 (Ct. App. 1987). The Court should also look to evidence of the employer's right to control the manner and the means of the individual's performance of his duties, how it compensates the individual, whether and how it furnishes equipment, and whether the employer has the right to terminate the individual without cause. *Id.*; *Blea v. Fields*, 2005-NMSC-029, ¶ 12, 138 N.M. 348, 120 P.3d 430. The New Mexico Supreme Court broadened this list to include six additional factors:

> (1) the type of occupation involved and whether it is generally performed without supervision; (2) the skill required for the job; (3) whether the employer furnishes the tools or instrumentalities for the job; (4) how long the individual has been employed; (5) whether the work is part of the employer's regular business; and (6) whether the employer is engaged in business activities.

*Blea*, 2005-NMSC-029, ¶ 12, 138 N.M. 348, 120 P.3d 430.

In *Savinsky*, an apartment complex hired the services of Cason, a security guard who worked for Sierra Security Service. Sierra decided Cason's rate of pay and actually paid him. 106 N.M. at 176. Further, the apartment complex did not supervise Cason, and although they would inform him of anything suspicious, he made his own decisions regarding how to handle security problems. *Id.* When security issues did arise, Cason called Sierra, not the apartment complex. *Id.* at 177. Sierra decided who to assign to patrol the apartments and their work hours, and controlled the manner and details of the patrol and response to incidents at the apartments. *Id.* Based on these facts, the court concluded that the apartments had the right to direct the result to be accomplished by Cason but did not have the right to control the manner in which he performed the details of that work, and therefore

he was an independent contractor. *Id.*

In *Blea*, the court considered whether a doctor was an employee of a hospital or if instead he was an independent contractor. *Id.* at ¶ 14. The doctor and the hospital had a written agreement containing a covenant not to compete restricting the doctor's practice, allowed the hospital to fire him with or without cause, and spelled out the terms of his service. The hospital required the doctor to maintain certain office hours and to fulfill other duties. *Id.* In return, the hospital paid him a salary, gave him employment benefits, and provided him with insurance; paid taxes and professional dues; and provided him with leave time. *Id.* It billed patients for his services and provided all of his supplies, equipment, and staff. *Id.* The court concluded that the doctor was an employee.

In contrast, in *Monett v. Dona Ana County Sheriff's Posse*, 114 N.M. 452, 840 P.2d 599 (Ct. App. 1992), the court concluded that a volunteer firefighter was not an employee of the sheriff's posse, a state fair, or the fair's owner. In that case, a volunteer firefighter accidentally injured a patron of the fair while he was driving a golf cart for the purpose of taking a coworker to her rodeo duty station. *Id.* at 455. The firefighter did not receive money, meals, or other compensation, but was not required to pay admission to the fairgrounds. *Id.* In transporting his coworker, the firefighter was acting on orders from his supervisor in the volunteer fire department, not from a fair official. *Id.* The fair owner provided the golf carts, insurance for the drivers, and instructions on how to use the carts. *Id.* at 456. The volunteer fire chief had directed that the fair owner be notified of the accident, and the owner told the volunteers not to worry because the fair had insurance. *Id.* Finally, the fair owner provided the volunteer fire department with a building and some furnishings for use during the fair. *Id.* Concluding that there was no fact issue as to whether the volunteer and defendants had a master-servant relationship, the court observed that no evidence was introduced

to show that any of these defendants had any right to control the details of the volunteers' work, that they paid him, or that they had the right to terminate his services. *Id*. Thus, it upheld the district court's decision that the volunteer was an independent contractor.

In this case, the Court concludes that Zarate and Carillo were independent contractors. As the court held in *Savinsky*, the primary test is whether the casino had the right to control the details of the work Zarate and Carillo performed. The evidence before the Court suggests that the casino did not have that right, although (in the language of *Savinsky*) it did have the right to direct the general result to be accomplished by them, i.e., that they help maintain order on the premises. For example, although the casino could and did ask the police officers to be more visible in areas of the casino where special events were taking place, as well as dispatch them to places where "incidents" were occurring, there is no evidence that it could or did direct them in the details of how to handle those situations. It appears that it was up to Zarate and Carillo to use their judgment as to whether to escort someone from the property, arrest them, or simply talk to them. Indeed, when it dispatched the police officers to an incident, it did so because it wanted the police to take over from the casino security guards. The casino's own employees—the casino security guards—were not authorized to detain or arrest patrons; as police officers, Zarate and Carillo had that authority, but there is no evidence that they exercised that authority at the request of the casino rather than at their own discretion. The court in *Savinsky* also reasoned that the employer's right to control the manner and the means of the individual's performance of his duties was relevant. Again, for the same reasons stated above, this factor weighs in favor of finding an independent contractor relationship. As for how it compensated Zarate and Carillo, the evidence shows that the casino paid them by check at their negotiated hourly rate without deducting income or Social security taxes, and without

providing them with any benefits. As for whether and how it furnished equipment, the only equipment that the casino provided to Zarate and Carillo was a dispatch radio; otherwise, they used their police uniforms, weapons, and badges. Thus, these factors also weigh against finding an employer-employee relationship. There is no evidence in the record regarding whether the casino had the right to terminate the defendants without cause, and therefore the final *Savinsky* factor is neutral.

Analysis of the additional factors set forth in *Blea* yields the same result. The type of work that Zarate and Carillo were doing–providing security and doing police work (insofar as they arresting those who committed crimes in their presence) is the type which vests a great deal of discretion in the officers. This work is typically not closely supervised. Generally speaking, police officers receive a great deal of training and therefore have special skills that a security guard who works for the casino does not. Again, other than the dispatch radio, the casino did not furnish the defendants with the tools or instrumentalities for the job. The parties have not submitted any evidence regarding how long Zarate and Carillo had worked for the casino. As for the final two factors, the casino is engaged in business activities—running a casino, racetrack, and bar—but having moonlighting police officers available and on site is ancillary to those business activities.

In sum, the evidence before the Court indicates that Zarate and Carillo were independent contractors who exercised a great deal of discretion in their work for the casino, and that the casino did not closely supervise their work. Also, the fact that the casino provided them with no equipment other than a dispatch radio and did not pay them as it would regular employees all compel the conclusion that they were independent contractors.

    **B.  Was Their Work Inherently Dangerous?**

Villareal suggests that even if Zarate and Carillo are independent contractors, the casino is still liable because they were engaged in an inherently dangerous activity. New Mexico law provides for an exception to the general rule that while employers generally are not liable for the negligence of an independent contractor, one who employs such a contractor is subject to liability for failure to take precautions if it should recognize that the work the independent contractor performs is likely to create a peculiar risk of harm to others unless special precautions are taken. *Budagher v. Amrep Corp.*, 97 N.M. 116, 120 (1981). *See also Saiz v. Belen Sch. Dist.*, 113 N.M. 387, 393, 827 P.2d 102, 108 (1992) (recognizing exceptions to rule of non-liability for independent contractors "where the employer has nondelegable duties (1) arising out of some relation toward the public or the particular plaintiff (e.g., duty of lessor to lessee), or (2) because of work that is specially, peculiarly, or inherently dangerous.") The rationale underlying the rule that an employer is liable for the acts of an independent contractor when the work is inherently dangerous is the idea that an employer should not be allowed to insulate himself from liability by hiring an independent contractor when the employer knows or should know that the work presents special risks of physical harm. *Id*. at 395, 827 P.2d at 110. Whether an activity is inherently dangerous is a question of law. *Id*. at 395-96, 827 P.2d at 110-11. New Mexico courts use a three-prong test to determine whether an activity is inherently dangerous:

> 1) the activity must involve an unusual or peculiar risk of harm that is not a normal routine matter of customary human activity; 2) the activity is likely to cause a high probability of harm in the absence of reasonable precautions; and 3) the danger or probability of harm must flow from the activity itself when carried out in its ordinary, expected way, such that reasonable precautions aimed at lessening the risk can be expected to have an effect.

*Gabaldon v. Erisa Mortgage Co.*, 1999-NMSC-039, ¶ 13, 128 N.M. 84, 990 P.2d 197. The first

prong "addresses the relative rarity of the activity and the [public's] . . . experience with the activity." *Id*. at ¶ 14 (internal quotation marks and citation omitted).  The second prong addresses "the expected probability of harm associated with the activity." *Id*. at ¶ 17. The third prong asks whether "the risk of harm flow[s] from the activity itself when carried out in an ordinary expected manner or [whether] the harm result[s] from the negligence of a particular actor[.]" *Id*. at ¶ 19.

New Mexico courts have found the installation of high-voltage lighting systems and the felling of large trees to be inherently dangerous. *See Saiz*, 113 N.M. at 398-99, 827 P.2d at 113-14 (holding that the installation of a high-voltage lighting system is inherently dangerous); *Enriquez v. Cochran*, 1998-NMCA-157, ¶ 98, 126 N.M. 196, 967 P.2d 1136 (holding that felling large trees is inherently dangerous).  On the other hand, they have refused to find that the operation of a wave pool, or a swimming pool, is inherently dangerous. *Gabaldon*, 1999-NMSC-039, ¶ 21, 128 N.M. 84, 990 P.2d 197 (holding that the operation of a wave pool is not inherently dangerous); *Seal v. Carlsbad Indep. Sch. Dist.*, 116 N.M. 101, 103-04, 860 P.2d 743, 745-46 (1993) (holding that operation of a swimming pool is not inherently dangerous). Similarly, the operation of eighteen-wheeler tractor-trailers is not inherently dangerous. *Valdez v. Yates Petroleum Corp.*, 2007-NMCA-038, ¶ 10, 141 N.M. 381.

The Court concludes that under New Mexico law, the activities that Zarate and Carillo were performing at the casino—working as armed police officers providing nighttime security services at an establishment where gambling and alcohol consumption were taking place—were inherently dangerous.  The Court notes that in *Savinsky*, 106 N.M. at 177, the New Mexico Court of Appeals stated in dicta that under the facts of that case, one could infer that providing private security services at an apartment complex was an inherently dangerous activity. Even more dangerous, then,

is the act of providing security at a casino that serves alcohol. *See also Monett*, 114 N.M. at 457 (observing that providing armed security services constitutes an extraordinary hazard).

Thus, the Court concludes that the casino cannot escape vicarious liability for the activities of Zarate and Carillo, its independent contractors, because those activities were inherently dangerous.

### C.  Authorities From Other States

The casino cites various cases from outside of New Mexico, including Georgia, Texas, Alabama, and the District of Columbia, in support of its argument that the Court should carve out a special exception to the doctrine of respondeat superior for employers of off-duty police officers. The casino's efforts fail for two reasons. First, the exception advocated by the casino does not exist under New Mexico jurisprudence; it simply has not been addressed. Because the casino's liability is a matter of state law, this Court must apply New Mexico law and attempt to rule as a New Mexico state court would on the issue. However, the casino has made no effort to analyze these foreign cases through the lens of existing New Mexico tort law and demonstrate why it believes the New Mexico courts would adopt the approach enunciated therein. In contrast, the courts in the cases cited by the casino relied upon their own state law as a basis for their conclusions. *See, e.g., Beck v. Paideia Sch., Inc.*, 381 S.E. 2d 132, 133-34 (Ga. Ct. App. 1989) (finding employer had no vicarious liability for moonlighting policeman, reasoning that Georgia "has long had the policy that an employer of a special policeman incurs no vicarious liability as a result of acts performed by the policeman in furtherance of his public duties."); *Whitely v. Food Giant, Inc*., 721 So.2d 207, 209 (Ala. Ct. App. 1998) (concluding that grocery store had no vicarious liability for off-duty police officer working as security guard because "the Alabama Supreme Court has held that when an off-

12

duty police officer witnesses an offense for which the perpetrator is arrested, the officer's status changes, and he is then acting in his capacity as a police officer and not his capacity as a security guard."); *Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 794-96 (Tex. 2006) (addressing Texas jurisprudence finding no vicarious liability for employers of independent contractors, and declining to adopt "personal character exception" for police officers because the rationales used by other states do not apply under Texas law); *Bauldock v. Davco Food, Inc.*, 622 A.2d 28, 33-34 (D.C. Ct. App. 1993) (same, applying District of Columbia decision issued in 1890). In contrast, the Court cannot find similar concepts in New Mexico law that would justify applying the exception for off-duty police officers that the casino advocates.

Second, even if the Court were to find that such an exception exists or should exist under New Mexico law, the current record contains no evidence to support its application. The casino's argument is premised on the contention that when they arrested Villareal, both Zarate and Carillo were acting within their lawful authority as police officers by enforcing the public laws and arresting someone who committed a crime in their presence. *See* Doc. No. 77 at pp. 7-8. As such, the casino contends that Zarate and Carillo were performing an official police function with which it had no duty or authority to interfere. However, for the purposes of this motion the parties stipulated to a set of facts which contains absolutely no information regarding the nature of the interactions between Villareal and Zarate. Instead, the facts before the Court demonstrate only that Zarate was escorting Villareal out of the casino when suddenly and out of the blue, Zarate performed a takedown on Villareal and arrested him. The record contains no evidence to support a conclusion that Villareal committed a crime in their presence or that the officers were performing a police function.

Thus, the motion for summary judgment will be denied as to Villareal's claims against the casino for vicarious liability for state law torts of assault and battery.

## II.     CLAIM FOR PREMISES LIABILITY

"An owner [of land] owes a visitor the duty to use ordinary care to keep the premises safe for use by the visitor."  N.M. UJI 13-1309 (NMRA 2008).  Further, New Mexico law provides:

> If an owner breaches the duty to use ordinary care to keep the premises safe for use by a visitor, resulting in injury to the visitor from the acts of a third person, the owner's breach of duty is to be compared with the conduct of the third person who actually caused the injury to the visitor, as well as with the visitor's own fault, in order to determine the owner's proportionate degree of fault. The owner's duty to protect visitors arises from a foreseeable risk that a third person will injure a visitor and, as the risk of danger increases, the amount of care to be exercised by the owner also increases. Therefore, the proportionate fault of the owner is not necessarily reduced by the increasingly wrongful conduct of the third person.

N.M. UJI 13-1320 (NMRA 2008).  Thus, under New Mexico's Uniform Jury Instructions, owners and occupiers of land who fail to exercise ordinary care for the safety of their visitors may be liable for injuries proximately caused, and that duty of care includes a foreseeable risk that a third person will injure a visitor.

Here, Villareal has asserted a premises liability claim against the casino for the injuries he received at the hands of third parties Zarate and Carillo.  In *Coca v. Arceo*, 71 N.M. 186, 189, 376 P.2d 970, 973 (1962), the New Mexico Supreme Court held:

> [T]he proprietor of a place of business who holds it out to the public for entry for his business purposes, is subject to liability to guests who are upon the premises and who are injured by the harmful acts of third persons if, by the exercise of reasonable care, the proprietor could have discovered that such acts were being done or about to be done, and could have protected against the injury by controlling the conduct of the other patron.

In this case, the casino argues that because it hired policemen as its independent contractors, it was entirely powerless to interfere with their arrest of Villareal. The casino contends that there is no authority for Villareal's position that a landowner's liability for the acts of third parties extends to police officers. The casino further argues that a landowner simply cannot have a duty to protect visitors from the acts of police officers because interfering with a police officer may subject one to civil and criminal liability. While the Court agrees with the casino that neither it nor its employees may lawfully interfere with a police officer performing his lawful duties, again the Court cannot conclude on the record before it that Zarate and Carillo were performing their duties in a lawful manner when they performed the take-down and arrest on Villareal—the parties simply did not present evidence on that issue. Accordingly, the motion for summary judgment will be denied on the claim for premises liability as well.

**IT IS THEREFORE ORDERED** that *Defendant My Way Holdings, LLC's Motion for Summary Judgment* [Doc. No. 69] is **DENIED**.

_____
**UNITED STATES DISTRICT JUDGE**